Mark C. Mao (SBN 236165)
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:    (415) 293-6800
Facsimile:    (415) 293-6899
Email:        mmao@bsfllp.com

Menno Goedman (SBN 301271)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
Telephone:    (202) 237-2727
Facsimile:    (202) 237-6131
Email:        mgoedman@bsfllp.com

*Attorneys for Plaintiffs Ripple Labs Inc.
and Bradley Garlinghouse*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RIPPLE LABS INC., a Delaware corporation; and BRADLEY GARLINGHOUSE, an individual, | Case No. 20-cv-2747-LB |
| *Plaintiffs*, | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| v. | Date:   October 22, 2020 |
| YOUTUBE, LLC, a Delaware company, | Time:   9:30 a.m. Place:  Courtroom B, 15th Floor Judge:  Magistrate Judge Laurel Beeler |
| *Defendant*. | Complaint filed:  April 21, 2020 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    FACTS ...................................................................................................................2

       A.     The Parties ................................................................................................2

       B.     A Scam Thrives on YouTube ....................................................................3

       C.     YouTube Materially Contributes to the Scam, Instead of Stopping It ................5

       D.     The Scam Irreparably Harms Ripple and Mr. Garlinghouse ................7

III.   ARGUMENT ........................................................................................................8

       A.     YouTube Knew of Trademark Infringement, But Failed to Stop the Scam .........8

       B.     YouTube Is an Information Content Provider and Cannot Invoke Section 230
              Immunity ................................................................................................16

       C.     Plaintiffs' UCL and Right of Publicity Claims Are Well Pleaded ..................21

IV.    CONCLUSION ...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)..............................................................16

*Berry v. Webloyalty.com, Inc.*, 2010 WL 8416525 (S.D. Cal. Nov. 16, 2010) ........................21

*Chloe SAS v. Sawabeh Info. Servs. Co.*, 2014 WL 4402218 (C.D. Cal. Sept. 5, 2014) ....................12, 13

*Coach, Inc. v. Celco Customs Servs. Co.*, 2012 WL 12883972 (C.D. Cal. Oct. 31, 2012)...............15, 16

*Cross v. Facebook*, 14 Cal. App. 5th 190 (2017) ...............................................................22, 23

*Dyroff v. Ultimate Software Grp.*,  934 F.3d 1093 (9th Cir. 2019)............................................19

*Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (2002) ..................................................24

*Erickson Prods., Inc. v. Kast*, 921 F.3d 822 (9th Cir. 2019) ....................................................12

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ...............................................................................................................................*passim*

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)....................................9, 15

*Ford Dealers Ass'n v. Dep't of Motor Vehicle*, 32 Cal.3d 347 (1982)....................................23

*Fraley v. Facebook*, 830 F. Supp. 2d 785 (N.D. Cal. 2011) ..................................18, 20, 23

*Free Kick Master LLC v. Apple Inc.*, 2016 WL 777916 (N.D. Cal. Feb. 29, 2016)....................15

*Gibson v. Craigslist, Inc.*, 2009 WL 1704355 (S.D.N.Y. June 15, 2009) .................................20

*Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. 2017)...........................................20

*In re Bitconnect Securities Litigation*, 2019 WL 9104318 (S.D. Fla. Aug. 23, 2019) ............................19

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir. 2013)............21

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)........................................................24, 25

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)...................................19, 20

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016)  ................................................*passim*

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) ....................................................................1

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999) ....................12

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936 (9th Cir. 2011)............8, 9, 11

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098 (N.D. Cal. 2008) ............11-12

*Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 287 F. Supp. 3d 1338 (N.D. Ga. 2017) ....................13

*McKay v. Hageseth*, 2007 WL 1056784 (N.D. Cal. Apr. 6, 2007)........................................24

iii

*Omega SA v. 375 Canal, LLC*, 2013 WL 2156043 (S.D.N.Y. May 20, 2013) ......................................... 14

*People v. Toomey*, 157 Cal. App. 3d 1 (1984) .................................................................................... 24

*Perfect 10, Inc. v. Google, Inc.*, 2010 WL 9479060 (C.D. Cal. July 30, 2010 ...................................... 23

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ......................................... 2, 23-24

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014) ..................................................... 17

*Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632 (1996) ..................................................... 25

*Ray v. BlueHippo Funding, LLC*, 2008 WL 1995113 (N.D. Cal. May 6, 2008) ..................................... 24

*Rivas v. Physician Labs., Inc.*, 2018 WL 6133722 (C.D. Cal. Oct. 24, 2018) .................................... 24

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) .............................................................................. 22

*Spy Optic, Inc. v. Alibaba.com, Inc.*, 163 F. Supp. 3d 755 (C.D. Cal. 2015) ................................. 10-11

*Spy Phone Labs LLC v. Google, Inc.*, 2016 WL 6025469 (N.D. Cal. Oct. 14, 2016) ................. 10, 11, 15

*Spy Phone Labs LLC v. Google, Inc.*, 2016 WL 1089267 (N.D. Cal. Mar. 21, 2016) ...................... 11, 13

*Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816 (N.D. Cal. 2016) ......... 9

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) .......................................................... 11, 13, 14

*Y.Y.G.M. SA v. Redbubble, Inc.*, 2020 WL 3984528 (C.D. Cal. July 10, 2020) ...................................... 13

**Codes & Statutes**

47 U.S.C. § 230(c)(1) ............................................................................................................... *passim*

47 U.S.C. § 230(f)(3) .................................................................................................................... 21

Cal. Bus. & Prof. Code § 17200 .............................................................................................. 23, 24

Cal. Bus. & Prof. Code § 17500 .............................................................................................. 23, 24

California Civil Code § 3344 .................................................................................................... 22, 23

**Rules**

Fed. R. Civ. Proc. 12(b)(6) ........................................................................................................... 1

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ........................................................................................ 12

Gaab & Reese, Rutter Cal. Practice Guide: Civil Procedure Before Trial at ¶ 14:117 ........................... 25

Jibin M. George, *Another XRP Giveaway Scam Goes Live – YouTube, Where Art Thou?*,
    AMBCrypto (August 20, 2020) ................................................................................................ 16

1

M. Pantalony, *Contributing to Infringement: Intermediary Liability After* Tiffany v. eBay *and* Louis Vuitton v. Akanoc, 105 Trademark Rep. 709, 712-13 (2015)...................................................... 14

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

# I.    INTRODUCTION

For nearly a year now, an extensive and harmful Scam has thrived on Defendant YouTube LLC's platform.   The Scam is simple enough: unknown individuals use YouTube accounts to impersonate Plaintiffs Ripple Labs Inc. and Mr. Bradley Garlinghouse (together, "Ripple"), and then trick unsuspecting people into handing over XRP (a virtual currency) on the false promise they will receive a windfall in return.   By actively participating in the Scam and utterly failing to stop it, YouTube contributorily infringed Ripple's trademarks, violated Mr. Garlinghouse's right of publicity, and engaged in unlawful, unfair, and fraudulent business practices under California law.

YouTube's Motion to Dismiss asks the Court to ignore the allegations in the Complaint and to set aside common sense.   This turns on its head the controlling Rule 12(b)(6) standard requiring the Court to accept all allegations as true and draw all inferences in favor of Ripple.   *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).   Because each of YouTube's three arguments fails, the Motion should be denied.

<u>First</u>, as to contributory trademark infringement, YouTube challenges the claim on only a single ground: YouTube supposedly lacks "knowledge" of a widespread and pervasive Scam occurring on its platform.   But this ignores more than ***350 takedown notices*** (and counting) sent to YouTube by Ripple. YouTube routinely failed to respond to these notices at all.   When YouTube did respond, it typically did so only weeks or even months later.   YouTube's position also disregards warnings from its own users and widespread media coverage of the Scam.   In short, the Complaint establishes that YouTube had actual and constructive knowledge of the Scam.   And, to the extent YouTube now disavows such knowledge, the only plausible explanation is that YouTube is willfully blind to the Scam. YouTube's feigned ignorance is thus directly contradicted by allegations in the Complaint and should be rejected.

<u>Second</u>, as to Ripple's state law claims, YouTube seeks to cloak itself in Section 230 immunity on the ever-expanding theory that it is merely an "interactive computer service."   But this ignores that YouTube ***developed content*** for the Scam by "verifying" hacked accounts and then ***profited*** from it.   It also ignores that this is not YouTube's first brush with cryptocurrency scams: YouTube has been sued previously for abetting a different cryptocurrency-related fraud.   And while YouTube escaped liability in that instance, the Court should reject YouTube's attempt to transform Section 230's limited protection

into an all-encompassing get-out-of-jail-free card.  This flawed interpretation of Section 230 would permit YouTube to, quite literally, do nothing, even when it knows of a pervasive fraud, actively develops content to render the fraud more deceptive, and has the tools to stop it.  That is not and should not be the law.

Third, YouTube contends that Ripple's state law claims are deficiently pleaded.  This argument overstates the law and misunderstands Ripple's allegations.   YouTube's claim that it did not "use" Ripple's protected trademarks or Mr. Garlinghouse's likeness is not credible: YouTube verified hacked accounts and sold ads that infringed on Ripple's marks and misappropriated Mr. Garlinghouse's name and image.  In the process, YouTube "used" Mr. Garlinghouse's likeness and directly participated in the fraud.  These allegations suffice.

The Court should reject YouTube's arguments, deny the Motion, and order the parties to move forward with discovery.  At a minimum, YouTube's Motion raises contestable questions of fact (over which YouTube has exclusive knowledge) that are best resolved after discovery and a trial on the merits.  Any other result will only encourage YouTube to continue its misconduct and will inevitably lead to more victims and greater harm to Ripple and Mr. Garlinghouse.[1]

## II.   FACTS

### A.   The Parties

Plaintiff Ripple Labs is a leading enterprise blockchain company.  Compl. ¶ 12.  Its mission is to create the Internet of Value, where money can move as quickly and securely as information.  *Id.* ¶ 19.  Ripple Labs offers a suite of enterprise software products to facilitate seamless and reliable cross-border payments.  *Id.* ¶ 20.  Ripple counts hundreds of financial institutions as customers.  *Id.*  XRP is a digital asset used by Ripple customers in cross-border transactions.  *Id.* ¶ 21.  Ripple owns several valuable trademarks, including the terms "Ripple" and "Ripple Labs," as well as the company's distinctive

---

[1] YouTube also engages in victim-blaming, taking issue that Ripple has "not filed any claims against the actual fraudsters." Mot. at 2, 7.  What goes unsaid, of course, is **why** Ripple has not brought such claims, namely, because ***only YouTube knows the identities of the "actual fraudsters."*** *See also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 823 (9th Cir. 2007) (Kozinsky, J., dissenting) ("It would certainly be much easier for us if plaintiff were suing the Stolen Content Websites, rather than the credit cards.  No doubt, they would if they could.  But direct infringers are sometimes too ubiquitous, too small, or too difficult to find.").  YouTube's exclusive access to this information supports allowing this case to proceed to discovery.  Meanwhile, YouTube's unfounded and inaccurate assertion that "XRP" is "particularly susceptible to being misused in scams," Mot. at 3, is contradicted by its own Motion, which elsewhere concedes "[t]hese schemes are not unique to" Ripple or XRP, *id.* at 2.

triskelion logo, which consists of three connected circles. *Id.* ¶ 23-25. These marks define Ripple's brand and identity. *Id.* ¶ 26.

Plaintiff Mr. Garlinghouse is the CEO of Ripple Labs. *Id.* ¶ 22. Since assuming the role in 2017, Mr. Garlinghouse has been the public face of the company. *Id.* Mr. Garlinghouse is a trusted voice and thought leader on financial technology and digital assets. *Id.*

YouTube is a video-sharing platform that generates $15 billion in annual revenue. *Id.* ¶ 27. YouTube enables its users and creators to view, post, and comment on video content. *Id.* ¶¶ 28-29. YouTube monetizes its users, its creators, and their content by selling ads. *Id.* ¶ 27. YouTube has robust tools to self-regulate content on its platform. *Id.* ¶ 30. YouTube regularly touts its capacity for self-regulation, including, as relevant here, its ability to detect misleading and fraudulent scams. *Id.* ¶ 30. For example, YouTube's Community Guidelines purport to bar "scams" and "other deceptive practices" that harm users. *Id.* ¶ 31. This includes "content offering cash gifts, 'get rich quick' schemes, or pyramid schemes." *Id.* YouTube moderates its platform through a combination of people and technology, which includes reliance on "cutting-edge machine learning." *Id.* ¶ 32.

### B.   A Scam Thrives on YouTube

Starting in 2019, a fraud—often referred to as "the XRP Giveaway Scam"—flourished on YouTube. *Id.* ¶¶ 1-3, 34. The Scam relies on spear phishing attacks, hacked YouTube accounts, and the misappropriation of Mr. Garlinghouse's likeness and Ripple's marks. *Id.* ¶ 2. But it also depends on YouTube's complacency and unwillingness to take action. *Id.* ¶ 3.

One common iteration of the Scam works as follows:

- A legitimate and popular YouTube creator—often with many thousands of subscribers—is targeted via an email spear-phishing attack.

- By responding to this email, the creator unknowingly and unintentionally shares his or her YouTube credentials with the attacker.

3

- These credentials are then used to strip the creator's YouTube channel(s) of its content (including all videos) and to transform it into a channel that impersonates Ripple's and/or Mr. Garlinghouse's official channel. For example:



- By using the hacked channels to impersonate the "official" channels of Ripple and Mr. Garlinghouse, the YouTube accounts infringe upon Ripple's protected trademarks, including its logo and name. Likewise, these accounts misappropriate Mr. Garlinghouse's image, name, and likeness.



- The hacked accounts then begin to run publicly available content related to Ripple, often an interview with Mr. Garlinghouse or other members of Ripple's leadership team. These videos often prominently display Ripple's protected trademarks, including its logo and name.

- Superimposed across these videos is a message instructing viewers on how to learn more about the fake "giveaway." For example, one message stated: "Details About The Giveaway Are In The Description."




4

- Beneath the video, the mechanics of the Scam are provided in greater detail:  To "participate" in the "Giveaway," the viewer is instructed "to send between 5000 XRP to 1,000,000 XRP" to a specific virtual currency wallet; in return, the post promises, the sender will receive "between 25,000 XRP to 5,000,000 XRP to the address you sent it from."



- After the victim sends XRP to the stated address, their XRP is gone and they never receive anything in return.  They become another victim of the Scam.

*Id.* ¶ 35.

Each instance of the Scam was and is substantially the same.  *Id.* ¶¶ 53, 65.  That is, a YouTube account is created or taken over to impersonate Ripple and/or Mr. Garlinghouse; the accounts misappropriate Ripple's marks and Mr. Garlinghouse's name and likeness; they post video content relating to Ripple or XRP; they use common terms such as "XRP," "Airdrop," and "Giveaway"; and they actively promote the Scam.  *Id.*

**C.  YouTube Materially Contributes to the Scam, Instead of Stopping It**

      **1.  YouTube learns of the Scam, but refuses to stop it.**

As early as November 2019, news reports in popular outlets started to report on YouTube's involvement with the Scam.  Compl. Ex. 8, Dkt. 1-1 at 141 ("Forbes Article").  One such article ran with the headline "A YouTuber With 350,000 Subscribers Was Hacked, YouTube Verified His Hacker."  *Id.* It detailed the saga of popular YouTube creator MarcoStyle, reporting that, following the hack, "[a]ll his videos were taken down" and "[h]is profile was changed to read 'Brad Garlinghouse,' with the name and picture of the real-life CEO of fintech company Ripple."  *Id.*; *see also* Compl. ¶ 40.  Shortly thereafter, "the hacker started running a livestream meant to scam viewers out of money."  Forbes Article, Dkt. 1-1 at 142.  "By the time the scam was over, it reportedly stole about $15,000 from viewer's Ripple wallets[.]"

OPPOSITION TO MOTION TO DISMISS
CASE NO. 20-cv-2747-LB

*Id.* The article details MarcoStyle's efforts to alert YouTube, explaining that "[a]s soon as Marco lost control of his channel, he contacted YouTube," who acknowledged the issue that same day, but did not resolve it until nearly a week later. *Id.*

Since the Forbes article in November 2019, Ripple sent YouTube more than 350 takedown notices in connection with specific instances of the Scam. *Id.* ¶ 47. These takedown notices related to accounts and channels that perpetuated the Scam by impersonating Mr. Garlinghouse, infringing on Ripple's marks, or both. *Id.* In many cases, due to YouTube's inaction, Ripple was compelled to send multiple takedown notices to YouTube for the same content. *Id.* ¶ 48 (identifying several representative, but not exhaustive, examples). At the time the Complaint was filed, new instances of the Scam continued to appear nearly every day, often amassing tens of thousands of views in a matter of hours. *Id.* ¶ 49.

YouTube was also put on notice by its own users, who were exposed to the Scam. *Id.* ¶ 52. For example, in March 2020, a user encountered a channel—which prominently featured Ripple's protected marks and used Mr. Garlinghouse's name and image to promote the Scam—and immediately alerted YouTube. *Id.* YouTube failed to take action and the next day the video had been viewed 85,000 times. *Id.*

Notwithstanding this news coverage, Ripple's takedown notices, or the warnings of its users, YouTube ignored the Scam or otherwise failed to act. *Id.* ¶ 48. Contrary to YouTube's claims, Mot. at 1, 4, YouTube routinely took no action at all; at other times, YouTube would act, but only belatedly after doing nothing for weeks or months. Compl. ¶ 48. For example, the Complaint identifies several instances where Ripple repeatedly gave notice to YouTube (including one hacked channel that Ripple reported to YouTube 14 times), but YouTube took corrective action only months later. *Id.*

### 2. YouTube materially contributes to the Scam.

YouTube was not satisfied with simply ignoring repeated warnings. Instead, it became an active and critical participant in the Scam. *Id.* ¶ 36. On at least one occasion—but potentially more—YouTube awarded a "verification badge" to a hacked channel that was actively promoting the Scam. *Id.* ¶¶ 40-41. Separately, YouTube also verified numerous YouTube accounts engaged in the Scam, which enhances the functionality of these accounts to, for example, permit live streaming or the posting of longer videos. *Id.* ¶ 43. Based on YouTube's own description of its verification process, YouTube verifies channels by

awarding "verification check marks." Compl. Ex. 10, Dkt. 1-1 at 154 ("YouTube Verification Policy"). In determining whether to award a verification badge or check mark, YouTube reviews channels to ensure they are "authentic" and "complete." *Id.* YouTube makes clear that it will not "verify channels that are trying to impersonate another creator or brand." *Id.* YouTube's verification criteria make clear that only YouTube can verify a channel—users cannot self-verify or verify other users. *Id.* YouTube's deliberate decision to affirmatively verify these channels and accounts is consequential: verification by YouTube communicates to YouTube's vast user base that the channel "is the official channel of a creator, artist, company, or public figure." *Id.*; *see also id.* ("Verified channels help distinguish official channels from other channels with similar names on YouTube.").

### 3. YouTube profits from the Scam.

YouTube had a strong financial incentive to contribute to the Scam's proliferation on its platform: ad revenue. *Id.* ¶ 37. At some point (discovery will reveal precisely when), YouTube started to sell ads to fraudsters engaged in the Scam. *Id.* These ads typically featured Mr. Garlinghouse's name and likeness, infringed on Ripple's marks, and promoted the Scam. *Id.* ¶¶ 37-38. YouTube's incentives were thus fully aligned with the fraudsters: sell infringing ads, optimize them to attract users, and profit as the Scam spreads.[2] A representative ad looked as follows:



### D. The Scam Irreparably Harms Ripple and Mr. Garlinghouse

The harm inflicted by the Scam is vast and ongoing. *Id.* ¶ 3. Although only YouTube knows precisely how far and wide it has spread, the Scam has been viewed by millions and defrauded victims out of millions of XRP, valued at hundreds of thousands of dollars. *Id.* The longer YouTube maintains its policy of inaction and affirmative misconduct, the more victims there will be.

---

[2] Because YouTube verified hacked channels and accounts, sold fraudulent, and optimized them for profit, YouTube's claim, Mot. at 4, that Ripple does "not allege that YouTube has any relationship with the scammers, that YouTube itself participated in or encouraged the scam, or that it created any of the allegedly fraudulent content" is demonstrably false. The same is true for YouTube's false assertion, *id.* at 3, that Ripple does not allege "YouTube in any way condones or encourages scams or fraudulent activities." That is precisely what Ripple alleges. Ripple's Complaint cannot be read any other way.

By creating the false impression that they are somehow associated with the Scam—or, worse yet, responsible for it—YouTube has irreparably injured Ripple's brand and Mr. Garlinghouse's reputation. *Id.* ¶ 4.  As early as November 2019, Mr. Garlinghouse felt compelled to address the confusion publicly: posting on Twitter about YouTube's complete failure to "take action" against "35+ users impersonating" him.  *Id.* ¶ 59.  Since then, Ripple has received extensive correspondence from victims, much of which (incorrectly) accuses Ripple of wrongdoing.  *Id.* ¶ 55.  Meanwhile, in February 2020, Mr. Garlinghouse's Wikipedia page was edited to prominently feature discussion of the Scam, wrongly implying that Mr. Garlinghouse may have perpetrated the Scam, a fact which reinforces the reputational harm he has suffered.  *Id.* ¶ 58.

## III.   ARGUMENT

YouTube's Motion raises three arguments.  Each argument fails by misstating the law, ignoring allegations in the Complaint, or both.  First, YouTube contends it cannot be contributorily liable for trademark infringement because "the Complaint offers nothing to suggest that YouTube had the degree of knowledge needed for a claim of contributory trademark infringement or that YouTube failed to act when it was supplied with the requisite knowledge."  Mot. at 13-17.  Second, YouTube contends Ripple's state law claims—for violations of the right of publicity and the UCL—are barred by Section 230 of the Communications Decency Act.  Mot. at 5-10.  And, third, YouTube asserts that, even aside from Section 230, the state law claims are not adequately pleaded.  Mot. at 10-13.  All of YouTube's arguments fail and the Motion should be denied.

### A.   YouTube Knew of Trademark Infringement, But Failed to Stop the Scam

To state a claim for contributory trademark infringement, Ripple must plead that YouTube "[1] continued to supply its services [2] to one who it knew or had reason to know [3] was engaging in trademark infringement."  *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 941 (9th Cir. 2011).  Ripple has done so.  Indeed, YouTube does not contest that third-party fraudsters engaged in direct infringement and that YouTube continued to provide services to these individuals.  Instead, YouTube challenges Ripple's trademark infringement claim on only a single ground: that YouTube lacked the requisite knowledge of infringement.  Mot. at 14 ("Plaintiffs try to satisfy the knowledge requirement in several ways, but none succeeds.").  This argument fails.

A viable claim for contributory trademark infringement must allege that defendants had "actual or constructive knowledge" that their users "were engaging in trademark infringement." *Louis Vuitton*, 658 F.3d at 943 ("An express finding of intent is not required."). Alternatively, even where actual or constructive knowledge is lacking, a claim is viable where defendants demonstrate a "willful blindness to direct infringement." *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 825-26 (N.D. Cal. 2016) (citing and quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)).

Here, Ripple's allegations make clear that YouTube had actual *and* constructive knowledge of infringement. Ripple's claim is therefore viable and should proceed. Moreover, to the extent YouTube now disavows such knowledge, it can only be the product of "willful blindness," which is likewise sufficient to support Ripple's cause of action.

### 1. YouTube had actual knowledge of the Scam, but failed to act.

The Complaint leaves no doubt that YouTube had actual knowledge of the Scam and the infringement it involved. To begin, Ripple sent over 350 takedown notices to YouTube in the six months preceding this action.[3] Compl. ¶ 47. Because each notice was specific to a particular account or channel, YouTube had actual knowledge of hundreds of instances of the Scam. Nevertheless, YouTube ignored or entirely failed to respond to many of these notices. *Id.* ¶ 48. And even when YouTube did take action, it did so only belatedly, after the harm had been inflicted. *Id.* The Complaint identifies several specific (but non-exhaustive) examples where YouTube had actual knowledge of infringement, but failed to act:

- Beginning on November 12, 2019, Ripple sent **14 takedown notices** to YouTube in regards to an account with 21,600 subscribers that falsely claimed to be Mr. Garlinghouse, Ripple's CEO, and actively promoted the Scam. Compl. ¶ 48. Despite these repeated takedown notices and YouTube's actual knowledge, the Scam remained active until February 19, 2020—**more than three months**. *Id.*

- On January 2, 2020, Ripple submitted a takedown notice to YouTube in regards to a hacked channel with 327,000 subscribers. *Id.* The hacked channel was blatantly infringing on

---

[3] Because "YouTube ignored or otherwise failed to address many of these takedown notices," *id.* ¶ 48, Ripple tried different approaches to compel YouTube to act. Many notices directly targeted the Scam (which involved infringement) or expressly flagged infringement, while others asserted impersonation. *Id.* ¶ 47. Other notices raised all of the above. But contrary to YouTube's claims, Mot. at 15, these varying approaches were a consequence of YouTube's inaction, not a cause of it. That is, YouTube's inaction forced Ripple to try different approaches to compel a response. YouTube cannot now fault Ripple for its persistence, let alone escape liability on this basis.

Ripple's protected marks.  Compl. Ex. 12, Dkt. 1-1 at 165 (featuring image of hacked channel using Ripple's marks to defraud).  Despite YouTube's actual knowledge of this Scam, the hacked account remained active for an additional three weeks.  Compl. ¶ 48.

At other times, YouTube was put on notice of specific instances of the Scam by users whose accounts had been hacked.  For example, on November 9, 2013, YouTube creator MarcoStyle's popular account was hacked.  Compl. ¶ 40.  The hackers immediately changed MarcoStyle's account to impersonate Ripple and Mr. Garlinghouse.  *Id.*  As part of this impersonation, the hacked channel prominently displayed Ripple's protected marks at the top of the page.  Forbes Article, Dkt. 1-1 at 141 (image of MarcoStyle's hacked YouTube channel using Ripple's marks and Mr. Garlinghouse's name and likeness).  MarcoStyle immediately notified YouTube of the hack and the resulting changes to his account.  *Id.*  Still, and despite having actual knowledge of this instance of the Scam, YouTube failed to act.  *Id.*  As a result of YouTube's failure, at least $15,000 worth of XRP was stolen.  Compl. ¶ 40.

YouTube also had actual notice of instances of the Scam from YouTube users who flagged offending accounts.  For example, in March 2020, a concerned user notified YouTube of an instance of the Scam.  Compl. ¶ 52.  Here, too, the hacked account sought to promote the Scam by prominently infringing on Ripple's protected marks and impersonating Mr. Garlinghouse by abusing his name and likeness.  *Id.*  Despite being put on notice and thus having actual knowledge of this hacked account, YouTube failed to immediately take down the channel.  *Id.*  Worse yet, the following day YouTube sold and began to run fraudulent ads directing unsuspecting users to the hacked account.  *Id.*  The channel's videos—which promoted the Scam—quickly amassed more than 80,000 views.  *Id.*  The ads (like the channel) also infringed on Ripple's marks and misappropriated Mr. Garlinghouse's likeness.  *Id.*

In short, the Complaint identifies numerous examples where YouTube had actual knowledge of a specific instance of trademark infringement, but inexplicably failed to act.  Contrary to YouTube's argument, Mot. at 14, this is sufficient to sustain Ripple's trademark claim.  Courts in this District have recognized that a contributory infringement claim is viable where, as here, the defendant failed to remove infringing material for several months after receiving an infringement notice.  *See Spy Phone Labs LLC v. Google, Inc.*, 2016 WL 6025469, at *5 (N.D. Cal. Oct. 14, 2016) ("*Spy Phone II*") (collecting cases).  Moreover, courts have affirmed the viability of contributory trademark infringement claims premised on far fewer instances of infringement and notification.  *See, e.g., Spy Optic, Inc. v. Alibaba.com, Inc.*, 163

F. Supp. 3d 755, 766 (C.D. Cal. 2015) (holding contributory trademark claim is viable where plaintiff alleged *only a single occasion* where defendant permitted a user to continue infringing after being put on notice).[4]   At a minimum, *Spy Phone II*—a case on which YouTube relies, Mot. at 17—indicates that YouTube's receipt of notice and belated action creates "a factual question [as to liability] that must be determined on summary judgment."  2016 WL 6025469 at *5.

For many of the same reasons, YouTube's reliance, Mot. at 14-15, on *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), and *Spy Phone Labs LLC v. Google, Inc.*, 2016 WL 1089267 (N.D. Cal. Mar. 21, 2016) ("*Spy Phone I*"), is unpersuasive.  In sharp contrast to the instant case, *Tiffany* did ***not*** involve a scenario where the defendant had actual knowledge of infringement but failed to act.  600 F.3d at 106 (finding no contributory liability because eBay "promptly" removed listings of which it had actual knowledge).  The same is true of *Spy Phone I*, where the court reasoned that Google "did not ignore" the "only instance" where it had actual knowledge of infringement.  2016 WL 1089267, at *4.[5]  Here, Ripple's allegations—which include numerous examples of YouTube ignoring and failing to address fraud, despite having actual knowledge—are readily distinguishable from these cases.

### 2.   YouTube had constructive knowledge of the Scam, but failed to act.

Even absent actual knowledge, a contributory trademark infringement claim is viable where a defendant had constructive knowledge, but failed to act.  *Louis Vuitton*, 658 F.3d at 943.  In evaluating whether a defendant possesses this kind of knowledge, the court should "'consider the extent of control exercised by the defendant over the third party's means of infringement' to determine if actual or constructive knowledge . . . would give rise to contributory liability."  *Louis Vuitton Malletier, S.A. v.*

---

[4] YouTube makes much of the claim that Ripple "do[es] not allege that YouTube had knowledge of any specific instances of trademark infringement that it failed to remove."  Mot. at 3.  Although this is factually incorrect, Compl. ¶ 48, it is also advances a legally untenable position.  YouTube appears to believe that, once it has notice of infringement, its only duty is to remove the content at some undetermined time in the future.  Such removal need not, apparently, be prompt, reasonably timely, or even tethered to when YouTube received notice.  But YouTube's view of the law would effectively nullify contributory infringement altogether, as YouTube could refuse to take any action until they are sued and then quickly take down the offending content.  That is not the law.

[5] Nor is *Spy Phone I* persuasive on the issue of whether Ripple's complaints were adequately "distinguish[ed]" from one another.  Mot. at 15.  There, the plaintiff "intentionally made spyware complaints . . . to remain anonymous" and sent only one trademark-related notice.  *Spy Phone I*, 2016 WL 1089267, at *4.  Here, in contrast, many of the 350 takedown requests sent to YouTube expressly raised trademark infringement, either exclusively or in conjunction with other violations.  To the extent some of these takedown notices focused only on impersonation, this was at least in part a product of YouTube's failure to respond to the other requests.  *Supra* n. 3.

*Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098, 1111 (N.D. Cal. 2008) ("*Louis Vuitton I*") (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999)).  "Constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have," and is therefore imputed.  *See Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 834 (9th Cir. 2019) (citing Black's Law Dictionary (10th ed. 2014)).

Ripple adequately alleges that YouTube possessed constructive knowledge of the Scam and related infringement, beyond the specific instances that were the subject of Ripple's takedown notices.  First, YouTube can (when it wants to) exercise extensive control over the YouTube.com platform.  Compl. ¶¶ 6 (detailing YouTube's robust tools for self-regulating content), 30-33 (describing YouTube's cutting-edge moderation tools).  Thus, while YouTube possesses the tools it needs to identify and stop instances of the Scam from occurring on its platform, it has simply chosen not to do so, a refusal that has continued through the present.  This favors a finding of constructive knowledge.  *See Louis Vuitton I*, 591 F. Supp. 2d at 1111.  Second, as noted, Ripple sent hundreds of takedown notices to YouTube regarding infringing content.  Compl. ¶ 47.  Because "[e]ach instance of the Scam is substantially similar," *id.* ¶ 53, these notices provided a roadmap for YouTube as to the accounts and channels likely to infringe in the future: specifically, accounts or channels that use Mr. Garlinghouse's name or likeness, prominently feature Ripple's marks, use word terms such as "Ripple" and "XRP," and run content relating to a purported "XRP Giveaway," *id.* ¶¶ 5 ("same scheme is replicated time and again"), 53 (detailing shared attributes of each instance), 65 ("each iteration . . . was and is substantially similar to all the others").  Third, various media sources "publicly reported that YouTube hosts fake Ripple accounts that perpetuate, promote, and profit from the Scam."  *Id.* ¶ 67; Forbes Article, Dkt. 1-1 at 141 (published in November 2019).  Thus, even before the hundreds of takedown notices sent by Ripple to YouTube, the specifics of the Scam were well documented.

These factors, taken together, sufficiently allege that YouTube had constructive notice over *all* instances of the Scam that occurred (and continue to occur) on its platform.  Courts in the Ninth Circuit have attributed constructive knowledge of infringement to defendants where, as here, they "established a haven for trademark infringement and counterfeiting."  *Chloe SAS v. Sawabeh Info. Servs. Co.*, 2014 WL 4402218, at *22 (C.D. Cal. Sept. 5, 2014) (denying defendant's motion for summary judgment because it

had constructive knowledge of the infringement but failed to act).  Critically, in such cases, "an individualized inquiry into whether the [defendants] were actually aware of each infringement . . . is unnecessary."  *Id.*  The same is true here: an individualized inquiry is unnecessary where each instance of the Scam is substantially the same, where YouTube exercises extensive control over its network, where YouTube's role in the Scam is widely documented in the press, and where YouTube has received hundreds of notices about specific instances of the Scam occurring on its platform.  On these facts, YouTube cannot be permitted to hide behind a contrived veil of ignorance.

Attributing constructive knowledge to a defendant is particularly appropriate where, as here, a defendant is given notice "of the specific instances of infringement" and there is no risk that remediation will inadvertently harm "legitimate" uses of the content.  *See Y.Y.G.M. SA v. Redbubble, Inc.*, 2020 WL 3984528, at *6 (C.D. Cal. July 10, 2020).  Under such circumstances, "all uses . . . are presumptively infringing."  *Id.* ("Here, after Brandy Melville notified Redbubble of the specific instances of infringement, Redbubble was also placed on notice that *all subsequent listings* displaying the same designs were also infringing.").  In much the same way, there is no "legitimate" XRP Giveaway run by Ripple. Consequently, there is no non-infringing content that uses Mr. Garlinghouse's image and Ripple's marks to promote the Scam that might inadvertently be swept up by potential remediation measures.  Therefore, each instance of the Scam on YouTube is "presumptively infringing."  *Id.*  And after receiving hundreds of takedown notices from Ripple in regards to "specific instances of infringement," YouTube was "on notice that all subsequent listings" that shared the key attributes—Mr. Garlinghouse's name or image, Ripple's marks, discussion of XRP or Ripple, and a promise of a "giveaway"—"were also infringing." *Id.*  To the extent YouTube contends that such remediation was not technologically possible, that is a factual issue that can be explored in discovery.

YouTube contends that Ripple's theory of constructive knowledge "fails as a matter of law."  Mot. at 16.  For support, YouTube relies on *Tiffany*.  Mot. at 16 (citing *Tiffany* and *Spy Phone I*, which cites *Tiffany*).  As an initial matter, *Tiffany* is an out-of-circuit decision that has never been adopted by the Ninth Circuit.  And it has been rejected by other circuits.  *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 287 F. Supp. 3d 1338, 1341-42 (N.D. Ga. 2017) ("But, the Second Circuit's decision in *Tiffany* is not binding on this Court."), *aff'd*, 932 F.3d 1303 (11th Cir. 2019).  Moreover, the Second Circuit's decision

in *Tiffany* came after a week-long bench trial where the parties presented substantial evidence, which renders it largely inapposite at the motion to dismiss stage.  Finally, *Tiffany* has been the subject of substantial criticism.  *See* M. Pantalony, *Contributing to Infringement: Intermediary Liability After* Tiffany v. eBay *and* Louis Vuitton v. Akanoc, 105 Trademark Rep. 709, 712-13 (2015) ("*Tiffany* undermines the efficiency premise of contributory trademark infringement for brands by allowing marketplaces, which are in the best position to address counterfeiting on their websites, to avoid liability. Online marketplaces such as eBay control access to their marketplaces and have all of the information to review listings.").  In sum, *Tiffany* does not bind the Court and the decision's procedural posture and policy implications should give the Court pause before applying its reasoning here.

Yet even if the Court finds *Tiffany* persuasive, YouTube's argument misunderstands its holding and misconstrues Ripple's allegations.  The holding in *Tiffany* is straightforward: while purely "general knowledge" cannot support a contributory infringement claim, it is sufficient to allege (and then prove) that the defendant had "[s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future[.]"  600 F.3d at 107.  However, contrary to YouTube's claim, Mot. 17, this does ***not*** require YouTube to know the ***identity*** of the infringer.  Rather, it requires sufficient notice to enable YouTube to know "which particular listings" are likely to infringe in the future.  *See Omega SA v. 375 Canal, LLC*, 2013 WL 2156043, at \*4 (S.D.N.Y. May 20, 2013) (rejecting the theory, nearly identical to YouTube's, that *Tiffany* requires "specific notice of counterfeit sales by an identified individual" before "it can be cast into liability").

Here, Ripple's allegations demonstrate that YouTube knew, or should have known, which "particular listings" were likely to "infringe in the future": that is, based on the hundreds of takedown notices and the substantial similarity between each instance of the Scam, YouTube should have known that an account or channel was likely to infringe where it (1) used Mr. Garlinghouse's name or image, (2) featured Ripple's protected marks, (3) used terms such as "giveaway" or "airdrop," and (4) ran content relating to Ripple or XRP.  This is not "general knowledge" of the type deemed insufficient in *Tiffany*. Thus, even if the Court accepts *Tiffany's* relevance (which Ripple cautions against), Ripple's allegations— by giving a roadmap of which accounts would like infringe in the future—satisfy the standard set forth therein.

These allegations and this argument are also readily distinguishable from the theory of constructive knowledge rejected in *Spy Phone II*. Mot. at 17 (analogizing to *Spy Phone II*). There, plaintiff was "essentially alleging that Google had a duty to preemptively remove apps that infringed on plaintiff's trademark, on the basis that . . . the Google Play Team is a small group who was put on notice that plaintiff possessed the 'Spy Phone' trademark." *Spy Phone II*, 2016 WL 6025469, at *6. This is a far cry from Ripple's theory in the instant case, which alleges that YouTube had specific knowledge of the accounts and channels likely to infringe in the future but nevertheless failed to act and instead profited from the Scam.

### 3. YouTube is willfully blind to the Scam and has failed to act.

In the Ninth Circuit, "contributory liability can be imposed if a defendant is 'willfully blind' to ongoing violations." *Free Kick Master LLC v. Apple Inc.*, 2016 WL 777916, at *11 (N.D. Cal. Feb. 29, 2016) (citing and quoting *Fonovisa*, 76 F.3d at 261-65). "To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate." *Coach, Inc. v. Celco Customs Servs. Co.*, 2012 WL 12883972, at *6 (C.D. Cal. Oct. 31, 2012) (citation and quotation marks omitted). "In most cases of willful blindness, the defendant has received explicit notice of specific infringing activity but disregarded it." *Id.* (collecting cases).

Here, to the extent YouTube disavows actual or constructive knowledge of the Scam and the infringement related thereto, the only plausible explanation is "willful blindness." Given Ripple's voluminous takedown notices, there is no question YouTube had actual knowledge of hundreds of specific instances of the Scam that occurred on its platform. YouTube was put on notice by its own users, whose accounts had been hacked or who had otherwise been exposed to the Scam, and YouTube's role in the Scam has been widely covered in the media. The overwhelming similarity across all instances of the Scam put YouTube on notice that accounts or channels were likely to infringe if they used Mr. Garlinghouse's image or name, infringed on Ripple's marks, and promoted a fraudulent giveaway. Faced with such overwhelming evidence of the Scam, YouTube not only failed to take remedial action, Compl. ¶¶ 1, 48, 50, but it actively began to support the Scam and profit from it, *id.* ¶¶ 8-10 (detailing YouTube's role in verifying accounts and profiting from ads). This failure and profiting has continued even after the

filing of Ripple's lawsuit and continues up through the present.[6]  Based on these allegations, YouTube must have "suspect[ed] wrongdoing." *Coach*, 2012 WL 12883972, at *6.  But instead of taking remedial measures, it "deliberately fail[ed] to investigate" in search of a profit.  *Id.*  YouTube's "willful blindness" provides an independent basis to support Ripple's contributory trademark infringement claim.

## B. YouTube Is an Information Content Provider and Cannot Invoke Section 230 Immunity

YouTube seeks to avoid liability for misappropriating Mr. Garlinghouse's right of publicity and violating the UCL by invoking Section 230(c)(1) of the CDA.  Mot. at 5-10.  But the protection offered by Section 230 is limited: it "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268 (9th Cir. 2016) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)).

Critically, Section 230's grant of immunity "applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content."  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008).  "A website operator," like YouTube, "can be both a service provider and a content provider."  *Id.*  Thus, "[i]f it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content."  *Id.*  "But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider."  *Id.*  In short, "a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content."  *Id.* at 1162-63.  That is the case here.

The Ninth Circuit has made clear that "a website helps to develop unlawful content"—and is thus an information content provider with respect to that content—"if it contributes materially to the alleged illegality of the conduct."  *Roommates.Com*, 521 F.3d at 1168.  More recently, the Court reiterated the "crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary

---

[6] *See, e.g.*, Jibin M. George, *Another XRP Giveaway Scam Goes Live – YouTube, Where Art Thou?*, AMBCrypto (August 20, 2020), https://eng.ambcrypto.com/another-xrp-giveaway-scam-goes-live-youtube-where-art-thou/ (describing instance of Scam that occurred on August 20, 2020 which had 23,000 views in two hours).

to the display of unwelcome and actionable content, and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Kimzey*, 836 F.3d at 1269, n. 4 (citations omitted).  Put simply, Section 230 immunity "does not apply to 'the *creation* of content' by a website."  *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014) (citations omitted) (emphasis in original).

### 1.   YouTube materially contributed to the Scam by verifying hacked accounts.

While YouTube contends it is not liable for content "created, developed, and uploaded to YouTube" entirely by a third party, Mot. at 7, Ripple's allegations are not so limited.  Ripple alleges that YouTube "award[ed] a 'verification badge' to hacked channels and accounts that were impersonating" Mr. Garlinghouse.  Compl. ¶¶ 10, 43.  In so doing, YouTube communicated to hundreds of thousands of viewers and subscribers that these hacked accounts and channels were "'the official channel of a creator, artist, company, or public figure.'"  *Id.* at ¶ 10.  Needless to say, "[t]his was completely false and profoundly harmful."  *Id.*

The specifics of one such instance are as follows: on November 3, 2019, YouTube creator MarcoStyle's account was hacked.  *Id.* ¶ 40.  The hackers changed his profile name to "Brad Garlinghouse" and replaced his profile image with a picture of Mr. Garlinghouse.  Forbes Article, Dkt. 1-1 at 141.  The hacked account then began to promote the Scam.  *Id.* at 142.  MarcoStyle immediately contacted YouTube, who acknowledged his complaint.  *Id.*  Nearly a week later, despite ***knowing*** that hackers were continuing to run Scam videos through the account, YouTube "inexplicably awarded the channel a verification badge." Compl. ¶ 40.  YouTube has exclusive knowledge of how often this occurred and how pervasive this conduct was.

YouTube's publicly available documentation on its verification process is limited.  YouTube Verification Policy, Dkt. 1-1 at 154.  As YouTube explains, however, when you see a "verification check next to a YouTube channel's name, it means that *YouTube has verified that channel*."  *Id.* (emphasis added).  "We," meaning YouTube, "won't verify channels that are trying to impersonate another creator or brand."  *Id.*  The process to determine eligibility for verification is driven by YouTube, not the user. *Id.*  As YouTube notes, "*we'll* review your channel" and "*we'll* check different factors to help verify your identity."  *Id.* (emphasis added).  Once a channel is verified by YouTube, then "it's the official channel of a creator, artist, company, or public figure."  *Id.*  As YouTube puts it, "[v]erified channels help distinguish

---

17

official channels with similar names on YouTube." *Id.*; *see also* Compl. ¶¶ 40-42. Thus, by verifying MarcoStyle's account, "YouTube communicated to its massive user base that YouTube had 'verified' the channel as the 'official channel' of the creator," (in this instance, Mr. Garlinghouse, based on the changed name and image on the hacked account). Compl. ¶ 41.

Here, YouTube's process for determining eligibility and awarding the verification badge are not actions "necessary to the display of unwelcome and actionable content." *Kimzey*, 836 F.3d at 1269, n. 4. Rather, this is communicative conduct—as YouTube emphasizes, "[i]f a channel is verified, it's the official channel of a creator, artist, company, or public figure," Compl. ¶ 10—that "contributes materially to the alleged illegality of the conduct." *Roommates.Com*, 521 F.3d at 1168. The "material contribution" to "illegality" by YouTube is apparent: the fundamental objective of the Scam was to impersonate Mr. Garlinghouse to trick and deceive unsuspecting individuals into believing that a fictitious account was "the official channel" of a "company" (i.e., Ripple) or a "public figure" (i.e., Mr. Garlinghouse). By awarding the verification badge, YouTube "contribute[d] to the content's illegality" by communicating that same false message to users, and thereby became "liable as a developer." *Roommates.Com*, 521 F.3d at 1171; *Fraley v. Facebook*, 830 F. Supp. 2d 785, 801-03 (N.D. Cal. 2011) (holding Section 230 does not bar right of publicity claim where Facebook was accused of "creating and developing commercial content," even where Facebook's "members provide some of the information used").

YouTube's effort (buried in a footnote) to rebut this theory is unpersuasive. Mot. at 9, n.2. YouTube asserts that the Ninth Circuit's decision in *Kimzey* "is directly on point" because "the Ninth Circuit held that Yelp's implementation of a 'star' rating system did not make it a content developer responsible for an alleged defamatory user review." *Id.* (citing and quoting *Kimzey*, 836 F.3d at 1268). But this analogy badly misses the mark. The *Kimzey* decision turned on the fact that Yelp's rating system "is based on rating inputs from third parties." 836 F.3d at 1270. All that Yelp contributed was a system that "reduce[d] this information into a single, aggregate metric." *Id.* As the court reasoned, this does not transform Yelp's system into something "other than user-generated data." *Id.*

Yet there is a clear distinction between *Kimzey* and Ripple's allegations and theory in the instant case. Unlike in *Kimzey*, YouTube's verification system is ***not*** purely a function of "inputs from third parties" and is far more than an aggregator of the same. *See generally* YouTube Verification Policy, Dkt.

---

18

1-1 at 154.  Here, Ripple alleges—informed by YouTube's own publicly available documentation—(1) that YouTube (not its users) determines whether a channel is eligible for verification; (2) that YouTube (not its users) provides the information relevant to that determination; (3) that YouTube (not its users) makes the ultimate decision as to whether a channel warrants verification; and (4) that YouTube (not its users) disseminates and communicates that message to the world.  Compl. ¶¶ 10, 40-42; *see also* YouTube Verification Policy, Dkt. 1-1 at 154.  Whereas the aggregated information in *Kimzey* could only ever come from Yelp's users (they were *user* ratings, after all), the opposite is true here: only YouTube could speak with the requisite authority to render a channel "official" (an individual user's self-verification would never be credible, hence the existence of YouTube's own system).

The other cases relied upon by YouTube are likewise distinguishable.  For example, *Dyroff v. Ultimate Software Grp.*, involved allegations that a website gave users "blank text boxes in which they could post and share experiences, questions and answers."  934 F.3d 1093, 1099 (9th Cir. 2019).  The court held that, as alleged, there was no "material contribution" to infringement where the defendant never "required users to post specific content, made suggestions regarding the content of potential user posts, or contributed to making unlawful or objectionable user posts."  *Id.*  These allegations have little, if any, relevance to the theory advanced by Ripple.  Similarly, YouTube's reliance, Mot. at 9, on the out-of-circuit decision in *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014), is also misplaced.  There, the court extended immunity to defendants who did not author the allegedly defamatory statements and opted not to remove the posts from their website.  *Id.* at 416.  Again, these allegations have little bearing on the instant case: here, in contrast to the allegations in *Jones* and *Dyroff*, YouTube is alleged to have authored and communicated new content (i.e., verification status, which only YouTube could authoritatively provide) that materially contributed to the channel's illegality.[7]

---

[7] YouTube also appears to celebrate the outcome of a prior case, *In re Bitconnect Securities Litigation*, 2019 WL 9104318 (S.D. Fla. Aug. 23, 2019), wherein YouTube invoked Section 230 to avoid liability when it was accused of aiding and abetting a different cryptocurrency-related fraud.  Mot. at 8. But the lawlessness and moral hazard inherent to YouTube's position should not be missed: YouTube concedes it was previously sued for abetting a cryptocurrency scam, that it avoided liability, and that it then adopted a posture of complete inaction when the instant Scam began to occur on its platform, even going so far as to sell ads that promote the Scam and to verify hacked accounts that were perpetuating it. YouTube could and should have been ***more vigilant*** after *In re Bitconnect*.  But, wrongly interpreting Section 230 as an all-encompassing shield, YouTube instead did nothing.

### 2.   YouTube materially contributed to the Scam by developing and selling fraudulent ads that infringe and misappropriate.

YouTube is also an information content provider by virtue of its sale of fraudulent ads that directly infringed on Ripple's marks and violated Mr. Garlinghouse's right of publicity.  Compl. ¶¶ 9, 37-38, 52, 64 ("YouTube also generates revenue *from* the infringing conduct," including by selling fraudulent ads) (emphasis added).  Moreover, YouTube *created* at least part of these ads.  *Id.* ¶¶ 37, 52 (depicting two examples of fraudulent YouTube ads).  For example, YouTube (and no one else) caused the ad to prominently feature the total number of "views" the ad had received.  Likewise, YouTube (and no one else) decided how the ad should be structured, where it should be presented, and how it could be optimized.

YouTube contends they are immune for this conduct because "the ads are third-party content," citing as authority two out-of-circuit decisions.  Mot. at 8-9 (citing *Gibson v. Craigslist, Inc.*, 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009), and *Dirty World*, 755 F.3d at 415).  But neither of these non-binding cases involved a scenario where, as here, the defendant profited by selling ads that facially infringed and misappropriated.  More to the point, the Ninth Circuit has "disavow[ed]" that a website is "*automatically* immune so long as the content originated with another information content provider." *Roommates.com*, 521 F.3d at 1171, n.31 (emphasis in original).  Such a rule "would eviscerate the exception to section 230 for 'developing' unlawful content 'in whole or in part.'"  *Id.* at 1171 (internal brackets omitted).  Here, YouTube *created* part of these ads, which themselves directly infringed on Ripple's mark and misappropriated Mr. Garlinghouse's likeness.

Thus, courts in this District have held that internet platforms similar to YouTube are "information content providers" and cannot invoke Section 230 where it is alleged they "creat[e] and develop[] commercial content," including, as relevant here, ads, even where users "provide some of the information used" in the ads.  *See Fraley*, 830 F. Supp. 2d at 801-02.  By the same logic, YouTube's reliance on *Kimzey* is misplaced, as that case did not involve allegations that Yelp (the defendant in *Kimzey*) had helped create and then sold ads which directly infringed trademarks and misappropriated images and names.  Rather, *Kimzey* involved a scenario where user-generated reviews were apparently promoted by Yelp on other platforms.  836 F.3d at 1270-71.

Courts in the Ninth Circuit have clarified this distinction.  For example, in *Gonzalez v. Google, Inc.*, which YouTube cites approvingly, Mot. at 9, the court dismissed ad-related claims on Section 230 grounds because there was no allegation "that Google's ads (which are themselves third-party content) are objectionable." 282 F. Supp. 3d 1150, 1168 (N.D. Cal. 2017).  That is, the plaintiffs in *Gonzalez* failed to allege a relationship between the ads and the problematic content.  *Id.*  Not so here.  Ripple alleges that YouTube sold ads to fraudsters where ***the ads themselves*** infringed on Ripple's marks and misappropriated Mr. Garlinghouse's likeness.  *See also Berry v. Webloyalty.com, Inc.*, 2010 WL 8416525, at *3 (S.D. Cal. Nov. 16, 2010) (rejecting Section 230 immunity where defendant had a role in creating advertisement).

To the extent YouTube's position is that it has no role whatsoever in creating the content of the ads that run on its platform (which the Complaint precludes), this presents a factual issue that cannot be resolved on the pleadings.

\*       \*       \*

Ripple has thus pleaded that YouTube is an information content provider by virtue of its channel verification and its Scam-related ads.  Consequently, YouTube's conduct is not immune under Section 230(c)(1).  At a minimum, however, Ripple should be permitted discovery into whether YouTube's processes for verifying channels and selling ads are, in fact, entirely dependent on user content (as YouTube argues, Mot. at 9, n.2) or if, instead, YouTube is "responsible" at least "in part, for the creation or development of" the offending content." *Roommates.Com*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)).

## C.    Plaintiffs' UCL and Right of Publicity Claims Are Well Pleaded

Ripple's state law claims—for violations of Mr. Garlinghouse's common law and statutory right of publicity, and for unlawful, unfair, and fraudulent acts under the UCL—are viable.  YouTube's narrow challenge to each claim fails.  As to the right of publicity claim, YouTube raises only a single argument: Ripple has not "allege[d] that YouTube itself 'used' Mr. Garlinghouse's identity." Mot. at 11.  Separately, YouTube contends that "vicarious liability" is "not a viable basis for a UCL claim," and that any claim under the UCL's fraud prong cannot lie because Ripple fails to allege reliance on a fraudulent statement.

21

1  Mot. at 12-13.  The Court should reject these arguments because they misread precedent and ignore

2  Ripple's actual allegations.

3        **1.    Ripple's right of publicity claim is viable because YouTube "used" Mr.
            Garlinghouse's name and likeness in ads.**

4

5        Under California law, a right of publicity claim requires a plaintiff to allege "(1) the defendant's

6  use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage,

7  commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *In re NCAA Student-Athlete*

8  *Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1273 n.4 (9th Cir. 2013).  The statutory right of

9  publicity, codified at California Civil Code § 3344, imposes liability on "[a]ny person who knowingly

10 uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of

11 advertising or selling[.]"  Cal. Civ. Code § 3344(a).  YouTube concedes that all but one of these elements

12 are adequately pleaded, limiting its challenge to whether it "used" Mr. Garlinghouse's identity at all.  Mot.

13 at 10-11.

14       Ripple alleges YouTube violated Mr. Garlinghouse's right of publicity by (1) using hacked and

15 fraudulent accounts to drive traffic to its platform, and (2) using Mr. Garlinghouse's name and likeness to

16 sells ads and generate revenue.  Compl. ¶¶ 9, 37-38, 78.  Specifically, YouTube "sold and helped the

17 scammers disseminate advertisements . . . to get more visitors to view and click on videos perpetuating

18 the Scam."  Compl. ¶ 9.  "Every such video posted on YouTube generates revenue by providing a vehicle

19 through which YouTube can deliver Scam ads on behalf of the scammers."  *Id.*  "YouTube profits from

20 the Scam by knowingly selling paid ads on behalf of the fraudsters who are impersonating Ripple and Mr.

21 Garlinghouse."  *Id.* ¶ 37.  In short, YouTube *used* these videos and ads to generate revenue and drive

22 traffic.  Each of these videos and ads featured Mr. Garlinghouse's name, photograph, and/or likeness.  *Id.*

23 ¶¶ 37-38 (example of advertisement), 52 (same).  Separately, Ripple alleges YouTube used Ripple's

24 protected marks and Mr. Garlinghouse's likeness to award a "verification badge" to at least one (and likely

25 more) of the hacked accounts.  YouTube Verification Policy, Dkt. 1-1 at 154.  Because YouTube

26 "verif[ies]" accounts to confirm authenticity, YouTube "used" Ripple's marks and Mr. Garlinghouse's

27 name and image in that process.

28

1       This is sufficient to support Ripple's right of publicity claim.  *See Sarver v. Chartier*, 813 F.3d

2  891, 905 (9th Cir. 2016) ("[W]e have upheld actions involving celebrities challenging the use of their

3  images in commercial advertising.") (collecting cases).  These allegations also satisfy Civil Code § 3344,

4  which makes clear that the "use" of Mr. Garlinghouse's name, photograph, or likeness "*in any manner*"

5  violates the right of publicity.

6       YouTube erroneously argues that *Cross v. Facebook*, 14 Cal. App. 5th 190 (2017) is "directly on

7  point."  Mot. at 11.  It is not.  In *Cross*, the court dismissed a right of publicity claim where it was alleged

8  that "Facebook displayed *unrelated ads* from Facebook advertisers adjacent to the content that allegedly

9  used Knight's name and likeness[.]"  14 Cal. App. 5th at 209 (emphasis added).  Thus, the court held, "the

10  evidence demonstrates that Facebook has not used Knight's identity, and any right of publicity claims fail

11  for this reason alone."  *Id.*

12       But Ripple has not alleged merely that YouTube sold "unrelated ads . . . adjacent to the content"

13  featuring Mr. Garlinghouse's likeness.  Rather, Ripple alleges YouTube helped create and sold ads to

14  fraudsters *featuring* and *using* Mr. Garlinghouse's name and image to drive traffic and generate revenue.

15  Compl. ¶¶ 9, 37-38, 78.  That distinction is dispositive: YouTube's ads *used* Mr. Garlinghouse's image to

16  generate revenue and drive traffic.  A right of publicity claim does not require more.  For much the same

17  reason, YouTube's reliance on *Perfect 10, Inc. v. Google, Inc.*, 2010 WL 9479060 (C.D. Cal. July 30,

18  2010), is misguided.  Unlike here, *Google* did not involve an allegation that Google had sold ads to

19  fraudsters that *actually used* the offending likeness.  2010 WL 9479060, at *13 (deeming allegation that

20  Google "provided the advertising" on websites that used names or likenesses as insufficient).

21            **2.**     **Ripple's UCL claim is viable.**

22       Ripple's UCL claim alleges unlawful, fraudulent, and unfair business practices by YouTube.

23  Compl. ¶¶ 90 (unlawful prong supported by trademark infringement and right of publicity claims), 91-96

24  (fraudulent prong supported by YouTube's substantial assistance to hacked accounts), 97 (unfair prong

25  supported by the same).

26       As an initial matter, because Ripple's contributory trademark infringement and right of publicity

27  claims are not barred by Section 230, a derivative UCL claim predicated on either of these causes of action

28

is viable.  *See, e.g.*, *Fraley*, 830 F. Supp. 2d at 812 (holding UCL claim is viable where statutory right of publicity claim under Civil Code § 3344 is not barred by Section 230).

YouTube also advances a categorical rule that theories of "vicarious liability" can never serve as predicates to the UCL's unlawful prong.  Mot. at 12-13 (citing *Perfect 10*, 494 F.3d at 808).  But this is not the law.  As just one example, the California Supreme Court has held that California's False Advertising Law (FAL) "incorporates the concept of principal-agent liability."  *Ford Dealers Ass'n v. Dep't of Motor Vehicle*, 32 Cal.3d 347, 361 (1982).  Because a violation of the FAL also gives rise to a claim under the UCL's unlawful prong, Cal. Bus. & Prof. Code § 17200, the California Supreme Court's decision in *Ford Dealers* precludes YouTube's proposed categorical rule.  Unsurprisingly, then, courts in this District—both before and after the Ninth Circuit's decision in *Perfect 10*—have found liability under the UCL on theories of secondary and vicarious liability.  *See, e.g.*, *Ray v. BlueHippo Funding, LLC*, 2008 WL 1995113, at *4 (N.D. Cal. May 6, 2008) (recognizing aiding and abetting theory of liability as viable UCL predicate); *McKay v. Hageseth*, 2007 WL 1056784, 3 (N.D. Cal. Apr. 6, 2007) (holding plaintiff stated a UCL claim on an aiding and abetting theory); *see also Rivas v. Physician Labs., Inc.*, 2018 WL 6133722, at *12 (C.D. Cal. Oct. 24, 2018) (holding UCL claims may be premised on vicarious liability).

The sounder interpretation of *Perfect 10* and the California Court of Appeals decision on which it relies, *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (2002), is that a theory of "vicarious liability" can support a UCL claim so long as the defendant's liability is "based on his personal 'participation in the unlawful practices' and 'unbridled control' over the practices" at issue, *id.* at 960.  *See also People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984) ("But if the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed.").  Thus, in *Emery*, where Visa lacked any agency relationship with the alleged third-party wrongdoers, no claim would lie under the UCL.  *Id.*  Likewise, in *Perfect 10*, where Visa "merely process[ed] credit card payments," a UCL claim could not rest on secondary or vicarious liability. 494 F.3d at 809.

In contrast, Ripple has alleged YouTube's "personal participation" in the unlawful practice of trademark infringement and misappropriation of Mr. Garlinghouse's likeness: YouTube sold ads that directly infringed on Ripple's marks and misappropriated Mr. Garlinghouse's image and name; YouTube

had actual knowledge of infringement, but failed to act; and YouTube materially contributed to the Scam by verifying accounts as legitimate and official.   Compl. ¶¶ 9-10 (discussing YouTube's aiding and abetting); 91 (alleging YouTube's substantial assistance), 95 (same).   By alleging YouTube's "personal participation in the unlawful practices" Ripple differentiates this case from *Emery* and *Perfect 10*, which have little applicability.

Finally, YouTube argues that Ripple's UCL claim for "fraudulent" conduct fails because Ripple does "not allege that they actually relied on any fraudulent statements."  Mot. at 13 (citing and discussing *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009)).   However, the California Supreme Court's holding in *In re Tobacco* was, by its own terms, limited to a "fraud theory involving false advertising and misrepresentations to consumers."  46 Cal. 4th at 325 n.17.   But claims under the UCL's fraudulent prong are not limited to such theories and "apply to business practices that do not arise out of misleading advertising."  Gaab & Reese, Rutter Cal. Practice Guide: Civil Procedure Before Trial at ¶ 14:117 (citing *Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 649 (1996)).   Here, Ripple's fraud claim is, at least in part, premised on YouTube's "substantial assistance and encouragement to hacked accounts perpetrating the Scam."  Compl. ¶ 91.   This includes, but is not limited to, "hosting, displaying, recommending, and developing in part the hacked accounts and their videos."  *Id.* ¶ 94.   Because Ripple's fraud claim is not premised entirely on false advertising and misrepresentations, the reliance limitation established in *In re Tobacco* is inapposite.

## IV.   CONCLUSION

For the foregoing reasons, YouTube's Motion to Dismiss should be denied in full.   Each of Ripple's three claims is viable and should proceed to discovery.   Ripple's contributory trademark infringement claim adequately alleges that YouTube knew, should have known, or was otherwise willfully blind to the infringement occurring on its platform.   YouTube concedes that the remainder of the claim is well-pleaded.   Ripple's right of publicity and UCL claim are adequately supported by allegations that YouTube used Mr. Garlinghouse's likeness to sell ads and otherwise directly participated in the unlawful conduct alleged.   Nor can YouTube escape liability for Ripple's state law claims by invoking Section 230: because it "help[ed] to develop unlawful content . . . it contribute[d] materially to the alleged illegality of the conduct."   YouTube thus forfeited Section 230's protections.

1

2

3      Dated: September 8, 2020                    Respectfully Submitted,

4                                             By:   /s/ *Menno Goedman*

5                                                  Menno Goedman (SBN: 301271)
                                                   mgoedman@bsfllp.com
6                                                  BOIES SCHILLER FLEXNER LLP
                                                   1401 New York Ave. NW
7                                                  Washington, DC 20005

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS
CASE NO. 20-cv-2747-LB